UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
IN RE EX PARTE APPLICATION OF SBK ART LLC,

Case No. XX-XX-XXX

Petitioner,

for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings

--------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF SBK ART LLC'S *EX PARTE* APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER TO TAKE DISCOVERY FROM LAZARD INC. FOR USE IN FOREIGN PROCEEDINGS

Robert S. Landy
Renée L. Jarusinsky
Amy C. Brown
Julián Alejandro Ríos
FORD O'BRIEN LANDY, LLP
275 Madison Avenue, 24th Floor
New York, New York 10016
Telephone: (212) 858-0040
Facsimile: (212) 256-1047
rlandy@fordobrien.com
rjarusinsky@fordobrien.com
abrown@fordobrien.com
jrios@fordobrien.com

*Counsel for Applicant*
*SBK ART LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

BACKGROUND ....................4

I. The Fortenova Group and the HPS Loan ....................5

II. SBKS' Ownership of Fortenova Group and Sale to Mr. Alketbi ....................5

III. The Fortenova Group's Actions After the Sale of SBK to Mr. Alketbi ....................7

IV. The Fortenova Group Manufactures a Refinancing Crisis and Works with Lazard to Engineer a Controlled Sale of MidCo to Open Pass ....................8

V. The Sale of MidCo ....................10

VI. The Requested Discovery is For Use in the Foreign Proceedings ....................11

A. The Malta Action ....................12

B. The Croatia Actions ....................12

C. The Netherlands Actions ....................13

*i.* *The First Dutch Summary Proceeding* ....................13

*ii.* *The Dutch Annulment Proceedings* ....................13

*iii.* *The Dutch Declaratory Proceeding* ....................14

D. The EU Actions ....................14

ARGUMENT ....................15

A. The Application Meets the Three Statutory Requirements ....................15

i. *Lazard "Resides" or is "Found" in the Southern District of New York* ....................15

ii. *The Requested Discovery is "For Use" in a "Foreign Proceeding"* ....................16

iii. *SBK is an "Interested Person"* ....................18

B. The Four Discretionary Factors Weigh in Favor of the Application ....................19

i. *Lazard is Not a Participant in the Foreign Proceedings* ....................19

ii. *The Foreign Tribunals are Receptive to U.S. Judicial Assistance* ....................20

iii. *The Application Does Not Circumvent the Rules of the Foreign Tribunals* ....................21

iv. *The Application is Narrowly Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure* ............................23

C. Granting the Application *Ex Parte* is Appropriate and Fair ..................................24

CONCLUSION.........................................................................................................................25

## TABLE OF AUTHORITES

Cases Page(s)

*Application of Esses*,
101 F.3d 873 (2d Cir. 1996) ..... 15

*Associacao dos Profissionais dos Correios v. Bank of New York Mellon Corp.*,
2022 WL 4955312 (S.D.N.Y. Oct. 4, 2022) ..... 23

*Automotive US, Inc., et al. v. Luxshare LTD*,
596 U.S. 619 (2022) ..... 16

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) ..... 22

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) ..... 20

*Granting Leave to Obtain Discovery for Use in Foreign Proc.*,
2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ..... 20

*Gushlak v. Gushlak*,
486 Fed. App'x. 215 (2d Cir. 2012) ..... 24

*In re Accent Delight Int'l Ltd.*,
791 F. App'x 247 (2d Cir. 2019) ..... 19

*In re Al-Attabi*,
2021 WL 4027021 (S.D.N.Y. Sept. 3, 2021) ..... 16

*In re Application for an Order Permitted Metallgesellschaft AG to Take Discovery*,
121 F.3d 77 (2d Cir. 1997) ..... 21

*In re B&C KB Holding GmbH*,
2023 WL 1777326 (S.D.N.Y. Feb. 6, 2023) ..... 18

*In re Bank J. Sarasin AG*,
2025 WL 3171876 (S.D.N.Y. Nov. 13, 2025) ..... 19

*In re GMJ Asset Mgmt. Co., Inc.*,
2022 WL 4547445 (S.D.N.Y. Sept. 29, 2022) ..... 16

*In re Guriev*,
2025 WL 2381702 (S.D.N.Y. Aug. 15, 2025) ..... 19

*In re Hornbeam Corp.*,
722 F.App'x 7 (2d Cir. 2018) ..... 24

*In re Itau Unibanco S/A – Nassau Branch*,
2025 WL 918462 (S.D.N.Y. Mar. 26, 2025) ..... 19, 22

*In re Oasis Core Investments Fund Ltd.*,
2024 WL 472984 (S.D.N.Y. Feb. 7, 2024) ..... 15

In re Safra,
2022 WL 3584541 (S.D.N.Y. Aug. 22, 2022) ..... 20

*In re SBK Art LLC*,
2024 WL 4264893 (S.D.N.Y. July 30, 2024) ..... 20

*In re SBK Art LLC*, No.,
24-MC-0147 (PAE) ..... 20

*In Re SBK ART LLC*,
2026 WL 478787 (2d Cir. Feb. 20, 2026) ..... 21

*In re Tiberius Grp. AG*,
2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020) ..... 22

*In re Top Matrix Holdings Ltd.*,
2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ..... 22

*In re West African Mineral Trading Ltd.*,
2024 WL 3862293 (S.D.N.Y. Aug. 19, 2024) ..... 21

*In re Zarzur*,
2024 WL 81517 (S.D.N.Y. Jan. 8, 2024) ..... 24

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ..... 18, 19, 21

*Jiangsu Steamship Co.*,
2015 WL 3439220 (S.D.N.Y. Feb. 5, 2015) ..... 16

*Mangouras v. Squire Patton Boggs*,
980 F.3d 88 (2d Cir. 2020) ..... 15

*Matter of Upper Brook Companies*,
2022 WL 18046694 (S.D.N.Y. Dec. 29, 2022) ..... 21

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015) ..... Passim

*Qualcomm Incorporated*,
2018 WL 6660068 (N.D. Cal. Dec. 19, 2018) ..... 21

*Sampedro v. Silver Point Cap., L.P.*,
818 F. App'x 14 (2d Cir. 2020) ..... 22

Statutes

28 U.S.C. § 1782 .......... Passim

Rules

Federal Rule of Civil Procedure 45(c)(3) .......... 24
Federal Rule of Civil Procedure 23 .......... 2
Federal Rule of Civil Procedure 26 .......... 23

## PRELIMINARY STATEMENT

This is SBK ART LLC's ("SBK") fourth *ex parte* application for discovery under 28 U.S.C. § 1782 ("Section 1782") in this Court and fifth overall. While the Court will likely be familiar with the dispute, the full history and argument is set forth herein for a complete record.

SBK submits this Section 1782 application seeking discovery from Lazard Inc. ("Lazard"), the international investment firm headquartered in New York City, for use in foreign proceedings (the "Application"). In short, SBK was the victim of a corporate raiding scheme that divested it of its indirect 42 percent ownership interest in Fortenova Grupa d.d. ("Grupa"), a major food producer and retailer headquartered in Zagreb, Croatia. From 2022 to 2024, the proponent of the scheme, Pavao Vujnovac, a Croatian businessman, and a Maltese company owned by him called Open Pass Limited ("Open Pass"), a 28 percent owner of Grupa at the time, engaged in a number of actions, either directly or indirectly, to damage SBK.

Specifically, Mr. Vujnovac and Open Pass, using their influence in the group company holding Grupa (the "Fortenova Group"): (1) ensured and/or authorized engagement of a New York-based law firm (Akin Gump LLP ("Akin")) to assist it in questioning the validity of the sale of SBK from Sberbank of Russia ("Sberbank") to H.E. Saif Jaffar Suhail Markhan Saif Alketbi (a wealthy, unsanctioned citizen of the United Arab Emirates), which ultimately convinced the Council of the European Union (the "Council") to sanction SBK as allegedly still being connected to Sberbank; (2) ensured and/or authorized that Grupa claimed the existence of SBK to be an obstacle to extension or restructuring of the Grupa's obligations to its main lender, the New York-based HPS Investment Partners ("HPS"); (3) influenced Grupa's management to procure dismal financial projections to make Grupa exceedingly unattractive to new investors; (4) ensured and/or authorized engagement of the French subsidiary of Lazard to conduct a hurried solicitation process

seeking new investors that, with the assistance of the manufactured refinancing crisis and abysmal projections, was bound to, and did, fail to attract investors; (5) ensured and/or authorized engagement of Houlihan Lokey EMEA LLP ("Houlihan Lokey"), KPMG Croatia d.o.o. ("KPMG") and Lazard's French subsidiary (again) to each issue fairness or valuation opinions regarding a massively depressed valuation (based on the financial projections and the failed sale process); and (6) utilized Akin (again) to structure and manage a sale of Grupa's Dutch holding company to a new structure created by Mr. Vujnovac at a highly depressed price, which resulted in SBK losing its stake in Grupa against its will and for wildly insufficient consideration.

The litigations that have so far resulted from these actions are all pending in European courts. However, given Open Pass's and Grupa's use of multiple U.S. headquartered service providers to implement the scheme, SBK has commenced several proceedings in this Court (as well as in the Central District of California) under Section 1782 against Kroll LLC (Grupa's transfer agent), Akin, HPS, and Houlihan Lokey. *This* new proceeding relates to Lazard. While Lazard provided services to Grupa and its Dutch holding companies via its French subsidiary, it is a Delaware corporation, listed on the New York Stock Exchange (LAZ). Lazard's headquarters are in New York City, and it maintains its records in New York via an arrangement with another well-known New York City-headquartered company that maintains its core servers in New York and New Jersey.

Lazard will be in possession of documents and information related to the plan and execution of the private tender process. These materials are expected to show that Lazard's French subsidiary was misled or was instructed in such a way so as to *de facto* obtain its assistance in structuring and presenting a distressed and time-constrained sale process. That process was designed to fail and designed to ensure that Lazard would then issue a positive opinion as to the

low price offered by Open Pass for acquisition of 100 percent of Grupa's Dutch holding. Open Pass needed a failed sale to potential investors before it could present an insider sale as the alternative and preferred option. Obtaining evidence from Lazard will assist SBK in its proceedings outside of the United States.

SBK currently has proceedings pending before various courts in the European Union (the "EU"), including in courts in Malta, Croatia, the Netherlands, in the General Court of the European Union ("General Court") and in the Court of Justice of the European Union (the "CJEU"), which, among other things, relate to challenging the transactions through which the fraud was perpetrated, seeking damages, and other relief (collectively, the "Foreign Proceedings"). The requested discovery is undoubtedly relevant to SBK's claims in the Foreign Proceedings and is fully justified under and supported by Section 1782. For the reasons set forth below, SBK respectfully requests that the Court grant the Application.

While Lazard may challenge the Application on the ground that Mr. Alketbi was unsuccessful in obtaining evidence in France relating to Lazard's refusal to allow him to participate in the sale process, it must be noted that: (1) Mr. Alketbi is not the applicant here; (2) that action is not one of the Foreign Proceedings and related to Mr. Alketbi's own potential claim in his personal capacity against Lazard's French subsidiary for his exclusion from the sale process; and (3) the French courts ultimately found that there was no legal basis to authorize the seizure of evidence and placement in escrow given the reputable IT system used by Lazard. As such, Mr. Alketbi's *ex parte* attempt in France to obtain evidence from Lazard in no way impedes SBK's timely effort by way of this Application to seek discovery for use in its own claims abroad. (Landy Decl. Ex. E (Pujos Statement at ¶¶ 4-17).[1]

---

[1] "Landy Decl." refers to the Declaration of Robert S. Landy, executed on June 16, 2026. "Pujos Statement" refers to the Statement of Matthias Pujos, executed on April 27, 2026.

## BACKGROUND

### I. The Fortenova Group and the HPS Loan

The Fortenova Group is one of the largest food producers and retailers in Europe and operates several prominent supermarket chains in Bosnia, Croatia, Montenegro, Serbia, and Slovenia. The Fortenova Group is southeastern Europe's largest private employer, with over 45,000 employees across approximately 30 production plants and more than 2,500 sales locations and distribution centers, generating annual revenues in excess of EUR 5 billion. (Application at ¶ 6). The Fortenova Group was formed in 2019 following the financial restructuring of Agrokor, a Croatian agricultural and food conglomerate that nearly went bankrupt. (*Id.* at ¶ 7). As part of that restructuring, creditors of Agrokor, including its largest creditor, Sberbank, became equity holders through depository receipts ("DRs") in a newly formed Dutch foundation called Fortenova Group STAK Foundation ("Fortenova STAK"), which held all shares in Fortenova Group TopCo B.V. ("TopCo"), the parent of Fortenova Group MidCo B.V. ("MidCo"), which in turn was the parent of Fortenova Group HoldCo B.V. ("HoldCo"), the direct owner of Grupa (all forming the Fortenova Group). (*Id.*). At that time, the corporate structure and collection of entities of the Fortenova Group was as follows:



All significant decisions by the Fortenova Group, such as those regarding governance, material business matters, and financing required the approval of DR Holders. (*Id*. at ¶ 8). In terms of financing, in 2019, Grupa received loans totaling EUR 1.157 billion. (*Id*.). Those loans were structured as senior floating rate notes and were secured by liens on the Fortenova Group's assets. (*Id*.). HPS was the lead arranger and majority holder of those notes (the "HPS Loan"). (*Id*.). The HPS Loan, which was initially due on September 6, 2023, became the single largest financial obligation of the Fortenova Group, and would later be used by it to justify changes, shape ownership, and exert control over Grupa. (*Id*. at ¶ 9).

## II. SBK's Ownership of Fortenova Group and the Sale to Mr. Alketbi

At the start of 2022, Sberbank held the largest single block of DRs, making it the largest indirect equity owner of Grupa with an indirect voting interest of 42.51 percent. (*Id*. at ¶ 10). Following the commencement of the military conflict between Russia and Ukraine in February 2022, Sberbank, understanding that it could soon become subject to international sanctions, urgently sought to dispose of its stake in Fortenova STAK. (*Id*.). At around the same time, Sberbank transferred its holdings in Fortenova STAK to a special purpose vehicle, SBK (the applicant here). (*Id*.)

As expected, soon after the transfer to SBK, Sberbank became the subject of numerous international sanctions, including by the United Kingdom, the United States, and the EU. (*Id*. at ¶ 11). The sanctions imposed on Sberbank were crippling as they froze the bank's assets, prohibited certain individuals and entities from dealing with the bank, and barred it from using the SWIFT payment system. (*Id*.). On July 21, 2022, the Council provided Sberbank a lifeline. (*Id*. at ¶ 12). The Council, together with introducing the relevant blocking sanctions against Sberbank, permitted it to sell its stake in various EU assets, which included its DRs in the Fortenova Group,

despite being subject to EU sanctions. However, the Council required that any sale be completed by October 31, 2022. (*Id.*).

Even with permission to sell SBK, finding a buyer in four months proved to be a tall order. (*Id.* at ¶ 13). The process was made even more difficult due to actions taken by the Fortenova Group that were aimed at diminishing SBK's existing governance rights and thus reducing its attractiveness to potential buyers. (*Id.*). For example, in early summer 2022, when no EU sanctions had yet been imposed on Sberbank, the Fortenova Group announced on its DR Holder portal that SBK could not exercise meeting or voting rights because of the sanctions imposed by the United Kingdom and the United States against Sberbank. (*Id.* at ¶ 14). This effectively prevented SBK from participating in the Fortenova Group's governance during a critical sale window. (*Id.*). At the same time, Open Pass requested that DR Holder meetings be held to approve a number of significant resolutions, including: (i) implementing higher decision-making thresholds, which effectively provided Open Pass with veto power for any future resolutions; and (ii) expanding the unilateral authority of Grupa's board, which included beneficiaries of Open Pass, to approve transactions up to EUR 500 million, a tenfold increase, and, for certain items, an unlimited authority. (*Id.* at ¶ 15). At that time, SBK managed to temporarily stop the approval of those resolutions by obtaining injunctions from courts in the Netherlands. (*Id.*).

At the eleventh hour on October 31, 2022, Mr. Alketbi, an experienced entrepreneur and investor based in the United Arab Emirates, acquired SBK from Sberbank for EUR 400 million. (*Id.* at ¶ 16).[2] At the time of the acquisition, Mr. Alketbi was not subjected to any international sanctions, which remains true today. (*Id.* at ¶ 17). Therefore, Mr. Alketbi's purchase meant that

[2] In addition to being an investor and philanthropist, Mr. Alketbi previously served as the Director General of The Office of His Highness the Crown Prince of Dubai, Sheikh Hamdan bin Mohammed bin Rashid Al Maktoum. (*Id.* at ¶ 16).

SBK was no longer subject to any international sanctions based on its prior relationship with Sberbank. (*Id.*). The sale of SBK to Mr. Alketbi led him to become the largest minority holder of Fortenova STAK with a voting interest of 42.51 percent. (*Id.*). The second largest equity holder was Open Pass (and thus Mr. Vujnovac), which held an indirect interest of nearly 28 percent. (*Id.*).

**III. The Fortenova Group's Actions After the Sale of SBK to Mr. Alketbi**

After acquiring SBK, Mr. Alketbi immediately informed the Fortenova Group's management of the transaction and sought to meet and discuss the company's future. (*Id.* at ¶ 18). Mr. Alketbi was met with much resistance from management, which was the result of a concerted effort by Open Pass, Mr. Vujnovac, and the Fortenova Group's Croatian management, to carry out a scheme to deprive SBK of its shareholder rights and seize control of the Fortenova Group. (*Id.*).

In furtherance of this effort, the Fortenova Group took the position that Mr. Alketbi's purchase was not bona fide and engaged in a public campaign to smear SBK and Mr. Alketbi. (*Id.* at ¶ 19). The Fortenova Group's position was that SBK remained under the influence of Sberbank, a sanctioned entity, which meant that the Fortenova Group could not have any dealings with SBK or Mr. Alketbi. (*Id.*). To advance that position, the Fortenova Group retained Akin to assist in lobbying the Council to impose sanctions on SBK. Those lobbying efforts paid off, as the Council announced in December 2022 that SBK was subject to EU sanctions due to its alleged continued association with Sberbank. (*Id.* at ¶ 20).

The Fortenova Group then exploited this development to exclude SBK and Mr. Alketbi from DR Holder meetings and approved the above governance changes. (*Id.* at ¶ 21). Although two-thirds of the DR Holders present at the meeting opposed the changes, they were approved with Open Pass's votes since the Dutch Court of Appeal, in summary proceedings, ruled that SBK, was not permitted to vote on any agenda item. (*Id.*).

## IV. The Fortenova Group Manufactures a Refinancing Crisis and Works with Lazard to Engineer a Controlled Sale of MidCo to Open Pass

Since late summer 2022, the Fortenova Group's management had been in discussions about the maturity of the HPS Loan, which was due on September 6, 2023. (*Id.* at ¶ 22). Management's position was that the presence of sanctioned DR Holders in the ownership structure (i.e., SBK) created serious issues for refinancing the HPS Loan. (*Id.*). Those "concerns" served as the central rationale for a series of measures that framed the HPS Loan as an urgent financial crisis and ultimately led to the manufactured and distressed sale of MidCo to Open Pass. All the while, refinancing options for the HPS Loan were readily available. (*Id.*).

In particular, in or around April 2023, HPS offered to extend the maturity date of the HPS Loan to November 2024, which the Fortenova Group did not accept before moving forward with the sale of MidCo arrangements. (*Id.* at ¶ 23). Further, the Fortenova Group discussed refinancing options with some of the world's largest banks, including J.P. Morgan Chase, Citi Bank, and Credit Suisse. (*Id.*). Rather than accepting HPS's offer, on April 26, 2023, the Croatian management of Grupa announced that it was launching a change in its shareholding and capital structure and that it would seek potential investors to purchase MidCo. (*Id.* at ¶ 24). Grupa's announcement also stated that it had engaged Lazard's French subsidiary to conduct a sale process and to initiate a value discovery process by testing a prospective sale of 100 percent of MidCo's shares. (*Id.*). In doing so, Lazard's French subsidiary was apparently tasked not only with marketing the transaction, but with presenting the sale as being necessitated by imminent refinancing constraints tied to the HPS Loan. (*Id.* at ¶ 25). This was announced by the Fortenova Group under the pretext that the sanctioned DR Holders created difficulties for its operations, and that while Grupa had a non-binding short-term refinancing offer from HPS itself, absent changes made to the capital structure, any refinancing of the HPS Loan would diminish the Fortenova Group's value. (*Id.*).

In May 2023, Lazard's French subsidiary conducted a private solicitation process, which suffered from numerous deficiencies. (*Id*. at ¶ 26). Such deficiencies were the product of deliberate structural choices rather than market conditions. (*Id.*). In particular, either upon instruction from Grupa and/or those controlling it, or at its own discretion, Lazard's French subsidiary: (i) set abnormally short deadlines for potential purchasers to bid and conduct due diligence; (ii) created an impression that default of the HPS Loan was imminent by inviting the potential bidders to indicate their proposals for refinancing; (iii) invited only a limited number of potential investors to bid for MidCo; and (iv) excluded Mr. Alketbi from the bidding process notwithstanding his repeated written expressions of interest to Lazard, Fortenova STAK, and TopCo. (*Id*. at ¶ 27). SBK believes that these choices were dictated by Open Pass, and/or supported by false information provided to it by Open Pass and/or Mr. Vujnovac, all of which should be demonstrated as a result of discovery. (*Id.*).

The deficiencies in Lazard's sale process underscore that the process was not designed to maximize value for all DR Holders by obtaining a fair market price (whatever it would have been) from the most suitable bidder. Instead, it was designed to (successfully) ensure that no bids would be received, which could then be used to justify the sale of MidCo to Open Pass at an artificially depressed price. (*Id*. at ¶ 28). As intended, none of the potential investors invited to submit offers to purchase MidCo expressed any interest in making such a purchase, which, by itself, is telling, given that Grupa is one of the largest food producers and retailers in southeastern Europe. (*Id*. at ¶ 29). In sum, the goal of the Lazard sale process was to create the appearance of a distressed sale that was not attractive to potential bidders and the Fortenova Group succeeded in doing so. (*Id*.).

## V. The Sale of MidCo

Upon achieving the goal of the flawed sale process, the Fortenova Group, effectively led by Mr. Vujnovac, quickly moved to sell MidCo to Open Pass and Mr. Vujnovac himself at an enormous discount. (*Id.* at ¶ 30). Not surprisingly, before finalizing the sale, the Fortenova Group approved and formally extended the maturity date of the HPS Loan to November 2024. (*Id.*). Rather than have Lazard conduct a second tender process or another market test after extending the maturity date, the Fortenova Group moved forward with the insider sale to Open Pass. (*Id*. at ¶ 31). The seamless extension of the maturity date and the refusal to conduct a genuine sale process confirms that the HPS Loan "refinancing crisis" was contrived and used to justify a controlled, urgent, and distressed sale process to fit Mr. Vujnovac's wider purpose of taking over the Fortenova Group. (*Id*.).

On October 16, 2023, Open Pass sent a binding offer for purchase of MidCo to a new Dutch holding structure created by Open Pass for a price between EUR 500 million and EUR 660 million. (*Id*. at ¶ 32). The Fortenova Group then arranged for "expert" opinions or fairness opinions (as applicable) to be issued by Lazard, Houlihan Lokey and KPMG confirming that the amount proposed by Open Pass constituted a fair price for MidCo. (*Id*.). Lazard's opinion, in particular, was relied upon by the Fortenova Group's decision-makers and presented to DR Holders as independent confirmation of fairness. (*Id*. at ¶ 33). However, the conclusions reached by the three "experts" were influenced by the failed Lazard sale process, which was designed to create the impression that there was no outside interest. (*Id.*). Further, shortly prior to the issuance of the "expert" opinions, a distorted and unduly pessimistic 2024 business plan was updated and supplied by Grupa's management, which the "experts" were instructed to rely and which they were not

permitted to independently substantiate or verify, thereby skewing their opinions on whether the sale price was "fair." (*Id.* at ¶ 34).

On December 19, 2023, a DR Holders meeting was held to rubber stamp the sale of MidCo to Open Pass from the remaining non-sanctioned, voting DR Holders, including Open Pass itself, and TopCo concluded the transaction less than ten days later on December 28, 2023. (*Id.* at ¶ 35). Upon the conclusion of the transaction and its completion in July 2024, SBK lost any ownership of MidCo and thus Grupa. SBK's loss was Mr. Vujnovac's gain, as he became the majority indirect owner of Grupa. (*Id.*).

The fraudulent scheme described above formed the basis of the Foreign Proceedings.

## VI. The Requested Discovery is For Use in the Foreign Proceedings

SBK requests discovery from Lazard to assist with its pending claims in foreign courts outside of the United States, including its ongoing lawsuits in Malta, Croatia, the Netherlands, and before EU courts, in relation to the transactions and damages suffered as a result of the actions of the Fortenova Group, Open Pass, Mr. Vujnovac, and others. Specifically, SBK seeks information and documents from Lazard concerning its French subsidiary's role in, and involvement with, the MidCo sale process and the valuation work performed in connection with that transaction. Those communications will show how the sale process was shaped and implemented at Fortenova's direction, how market interest was constrained and bidder participation limited, and how Lazard's valuation conclusions were reached based on information provided to it by the Fortenova Group. Lazard's internal communications and documents will further show what information was provided to it, what assumptions were challenged or accepted, and how the process was ultimately presented to the Fortenova Group's stakeholders and the market. This evidence will assist SBK in each of the Foreign Proceedings, which are summarized below.

### A. <u>The Malta Action</u>

SBK currently has a lawsuit pending in the Civil Court of Malta seeking damages in relation to the unlawful actions of Open Pass and others, including those that resulted in the sale of MidCo to Open Pass (the "Malta Action"). (Landy Decl. Ex. A (Refalo Decl. at ¶¶ 1, 5)).[3] In the Malta Action, SBK seeks damages against Open Pass, Gain Alliance, Fortenova STAK, Mr. Vujnovac, Vladimir Tunjic, Josip Jurcevic, Damir Spudic, and Fabris Perusko (the "Maltese Defendants"). (*Id*. at ¶ 5). In addition to filing the damages claim, SBK sought and was granted an order to garnish the assets of the Maltese Defendants in the amount of EUR 40 million (the "Garnishee Order") and a warrant seizing all securities held by the Maltese Defendants (the "Warrant"). (*Id*.).

### B. <u>The Croatia Actions</u>

In 2025, SBK brought actions in Croatia seeking to enforce the Garnishee Order and Warrant issued in the Malta Action to prevent the dissipation and concealment of assets (the "Croatia Actions"). (Landy Decl. Ex. B (Markušić Decl. at ¶¶ 1, 5)).[4] In 2025, numerous Municipal Courts in Croatia, which are the courts of first instance, dismissed SBK's enforcement actions on the basis that SBK did not have standing in the Croatian courts given that it is subject to EU sanctions. (*Id*. at ¶ 5). SBK appealed the court of first instance's decisions. (*Id.*). A number of appellate courts have reversed those decisions and remanded the cases to the courts of first instance to consider the merits of SBK's enforcement action. (*Id.*). The proceedings are currently ongoing. (*Id.*).

---

[3] "Refalo Decl." refers to the Declaration of John Refalo, executed on June 10, 2026.

[4] "Markušić Decl." refers to the Declaration of Darko Don Markušić, executed on June 10, 2026.

## C. The Netherlands Actions

SBK is also a party to numerous proceedings pending in various courts in the Netherlands (the "Netherlands Actions"). Each of the Netherlands Actions is discussed in turn below.

### *i. The First Dutch Summary Proceeding*

Prior to the sale of MidCo to Open Pass, SBK filed an application with the District Court of Amsterdam seeking an order to: (i) allow SBK to attend DR Holder meetings and for its votes to be accepted; or (ii) prohibit the Fortenova Group from changing its corporate governance rules until a decision regarding SBK's voting rights was made by a competent authority (the "First Dutch Summary Proceeding"). (Landy Decl. Ex. C (Zandbergen Decl. at ¶ 5)).[5] While the District Court of Amsterdam granted SBK's application, the Amsterdam Court of Appeal overturned the lower court's ruling. (*Id.*). SBK appealed the Amsterdam Court of Appeal's ruling to the Dutch Supreme Court, which subsequently informed the parties that, in a process similar to a certified question in the United States, the Dutch Supreme Court intended to ask preliminary questions of law to the CJEU regarding the rights of sanctioned persons to participate in voting in European companies. (*Id.*). The First Dutch Summary Proceeding is ongoing following the issuance of the CJEU's opinion, which will guide the decision of the Dutch Supreme Court. (*Id.*).

### *ii. The Dutch Annulment Proceedings*

SBK filed three claims against Fortenova STAK and TopCo with the District Court of Amsterdam for the annulment of: (i) corporate resolutions that were included on the agenda for the August 9, 2022 DR Holders meeting, (ii) corporate resolutions that were adopted in or prior to June 2023; and (iii) corporate resolutions related to the sale of MidCo to Open Pass (collectively, the "Dutch Annulment Proceedings"). (*Id.* at ¶ 6). All annulment claims have been stayed pending

[5] "Zandbergen Decl." refers to the Declaration of Bart Zandbergen, executed on June 15, 2026.

the decision in the First Dutch Summary Proceeding. (*Id.*) Meanwhile, a joint hearing is scheduled for November 10, 2026.

*iii.* *The Dutch Declaratory Proceeding*

On May 21, 2024, among others, Fortenova STAK, TopCo, MidCo, HoldCo, Open Pass, and Mr. Vujnovac filed a claim against SBK and others with the District Court of Amsterdam seeking declarations from the court that: (i) the Fortenova Group's resolutions approving the sale of MidCo to Open Pass were valid; (ii) the sale of MidCo to Open Pass was not unlawful; and (iii) none of the plaintiffs acted unlawfully in connection with the sale of MidCo to Open Pass (the "Dutch Declaratory Proceeding"). (*Id.* at ¶7). In October 2025, the District Court rejected jurisdictional challenges raised by SBK and others. (*Id.*). The proceeding is ongoing, and SBK intends to file a counterclaim for damages against the plaintiffs. (*Id.*). Meanwhile, a hearing is scheduled for November 10, 2026.

*iv.* *The Merger Opposition Proceedings*

On January 20, 2025, SBK lodged an opposition with the District Court of Amsterdam against the contemplated legal merger between: (i) the Dutch holding structure that acquired MidCo; (ii) MidCo; and (iii) HoldCo. (*Id.* at ¶ 8). Further to a hearing on May 1, 2026, on June 11, 2026, the court dismissed SBK's claims and SBK is considering appeal.

**D. The EU Actions**

As noted above, in December 2022, the Council imposed EU sanctions on SBK. (Application at ¶ 20). Subsequently, the Council has reimposed sanctions against SBK on seven occasions, as EU sanctions are reviewed by the Council for extension every six months. (Landy Decl. Ex. D (Lansky Decl. at ¶ 5)).[6] SBK has consistently challenged the renewal or relisting of

[6] "Lansky Decl." refers to the Declaration of Dr. Gabriel Lansky, executed on June 16, 2026.

EU sanctions before the General Court of the EU and the CJEU and will continue to do so. (*Id.*). Currently, SBK has three ongoing proceedings before the General Court and the CJEU challenging the imposition of EU sanctions against SBK on the basis that it is no longer controlled by Sberbank (the "EU Actions"). (*Id.*). In addition, as noted above, SBK participated in the CJEU proceeding relating to the questions presented to that court by the Dutch Supreme Court. (Landy Decl. Ex. C (Zandbergen Decl. at ¶ 5)).

## ARGUMENT

For the reasons set forth below, SBK respectfully submits that this Court should grant the Application because: (1) it meets each of the three statutory requirements set forth in Section 1782; (2) the four discretionary factors established by controlling case law weigh in favor of granting the Application; and (3) it is appropriate and fair for it to be granted *ex parte*.

### A. The Application Meets the Three Statutory Requirements

Section 1782(a) requires an applicant to satisfy the following three statutory requirements: (1) the individual or company from whom discovery is sought must reside in or be found in the district in which the application is brought; (2) the discovery sought is for use in foreign proceedings; and (3) the applicant is an "interested party." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97 (2d Cir. 2020); *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015); *In re Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996). As set out below, SBK satisfies each of the three statutory requirements.

#### *i. Lazard "Resides" or is "Found" in the Southern District of New York*

Under the first statutory requirement, an applicant can establish that an individual or company resides in the Southern District of New York (the "District") if its office is located within the District. *In re Oasis Core Investments Fund Ltd.*, NO. 23-MC-402 (SHS), 2024 WL 472984,

at 2 (S.D.N.Y. Feb. 7, 2024) (finding that a corporation was "found" in the district because its principal place of business was located in New York City); *In re GMJ Asset Mgmt. Co., Inc.*, No. 22-MC-123 (JW), 2022 WL 4547445, at *2 (S.D.N.Y. Sept. 29, 2022) (finding that a corporation was "found" in the district as it had an office in New York City that served as its U.S. headquarters); *In re Al-Attabi*, 21-MC-207 (VSB), 2021 WL 4027021, at *2 (S.D.N.Y. Sept. 3, 2021) (same).

On its public website, Lazard states that the "United States has been Lazard's home since the firm was incorporated in New Orleans in July 1848." The website also states that Lazard has its "global headquarters in New York" and is located at 30 Rockefeller Plaza, New York, NY 10112. Lazard unquestionably resides within the District for purposes of Section 1782 and the first statutory requirement is satisfied.

***ii. The Requested Discovery is "For Use" in a "Foreign Proceeding"***

To satisfy the second statutory requirement, an applicant must demonstrate that the discovery sought is for use in a foreign proceeding. *Automotive US, Inc., et al. v. Luxshare LTD,* 596 U.S. 619, 623 (2022) (finding that "foreign proceedings" for purposes of Section 1782 includes only proceedings before governmental or intergovernmental adjudicative bodies); *In re GMJ Asset Mgmt. Co., Inc.*, 2022 WL 4547445, at *4 (explaining that the second statutory requirement is interpreted broadly and does not require the foreign proceedings to even be pending or imminent); *Jiangsu Steamship Co.*, No. 14-CV-9997 (CM), 2015 WL 3439220, at *4 (S.D.N.Y. Feb. 5, 2015) (stating that the second statutory requirement extends to foreign proceedings that are reasonably contemplated).

As discussed above and set out further below, the proceedings in Malta, Croatia, the Netherlands, and the EU are all ongoing and constitute foreign proceedings under Section 1782.

SBK seeks evidence regarding actions taken in furtherance of the fraudulent scheme that deprived it of its indirect ownership interest in Grupa, which it will use to advance and defend its positions in each of the Foreign Proceedings. *Mees v. Buiter,* 793 F.3d 291, 298, (2d Cir. 2015) (explaining that evidence is "for use" in a foreign proceeding if it can "be employed with some advantage or serve some use in [that] proceeding.").

In the Malta Action, SBK seeks damages against the Maltese Defendants in relation to the unlawful actions of Open Pass and others towards SBK, including those that resulted in the sale of MidCo to Vujnovac. (Landy Decl. Ex. A (Refalo Decl. at ¶ 5)). SBK believes that Lazard is in possession of documents and information related to the orchestration of the MidCo sale process, including the decision-making process regarding which third parties to approach and the manner in which the transaction was presented to the market and then endorsed as "reasonable to conclude," which would shed light on the misconduct by the Maltese Defendants that ultimately resulted in SBK losing its stake in Grupa. (*Id.* at ¶¶ 6, 7**).**

Likewise, in the Croatia Actions, documents possessed by Lazard will show the roles played by the Maltese Defendants in the sale of MidCo to Vujnovac. This will assist SBK with supporting its enforcement action and will provide evidence to defend against challenges by the Maltese Defendants in Croatia seeking to prevent the enforcement of the Garnishee Order and Warrant. (Landy Decl. Ex. B (Markušić Decl. at ¶¶ 6, 7**)).**

The Netherlands Actions all concern the corporate steps taken by the Fortenova Group to prevent SBK from participating in various internal processes, including those that resulted in the sale of MidCo to Open Pass. (Landy Decl. Ex. C (Zandbergen Decl. at ¶¶ 5-8)). Those actions included precluding Mr. Alketbi from bidding for MidCo during the auction process, refusing to provide SBK with information regarding the sale, the sale of MidCo at a depressed price, and

denying SBK the right to attend and vote during DR Holder meetings. (*Id.*). The discovery requested from Lazard will show how the sale process and valuation were presented, supported, and relied upon to justify the sale of MidCo to Open Pass at an artificially depressed price, which will assist SBK in the Netherlands Actions, including the Dutch Declaratory Proceeding, in which SBK is a defendant and intends to pursue a counterclaim against the plaintiffs. (*Id*. at ¶¶ 9, 10).

The EU Actions center on the wrongful sanctioning of SBK after it was wholly owned by Mr. Alketbi. (Landy Decl. Ex. D (Lansky Decl. at ¶ 5)). The discovery sought from Lazard is essential to the EU Actions because it addresses the core issue of whether the Fortenova Group and its advisers influenced the Croatian government and the Council to impose EU sanctions on SBK and used those sanctions as a tool in the corporate fight. (*Id*. at ¶¶ 6-7).

For these reasons, the discovery requested is relevant and for use in the Foreign Proceedings. The second statutory requirement is satisfied by SBK.

***iii. SBK is an "Interested Person"***

To meet the third statutory requirement, the applicant must demonstrate that it is an "interested person," which is interpreted broadly by courts to include a litigant, a potential litigant, or even a victim. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (stating that there is "[n]o doubt litigants are included among, and may be the most common example of, the interested persons who may invoke [Section] 1782" but that the text of Section 1782 "plainly reaches beyond the universe of persons designated [as] litigant[s]"); *In re B&C KB Holding GmbH*, No. 22-MC-00180 (LAK) (VF), 2023 WL 1777326, at *3 (S.D.N.Y. Feb. 6, 2023) (finding that an applicant that was the alleged victim of a fraud and had a right to submit evidence in foreign criminal proceedings was an "interested person" for purposes of Section 1782).

As set out above, SBK is the victim of a fraudulent corporate raiding scheme and is a litigant in the Foreign Proceedings. The third statutory requirement is undoubtedly satisfied.

**B. The Four Discretionary Factors Weigh in Favor of the Application**

The four discretionary factors set out in the U.S. Supreme Court's decision in *Intel* strongly weigh in favor of granting the Application. Those discretionary factors include: (1) whether the person from whom discovery is sought is a participant in the foreign proceedings; (2) the nature of the foreign tribunal and the receptivity of the foreign government or court abroad to U.S. federal court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65; *In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 250 (2d Cir. 2019); *Gorsoan Ltd v. Bullock*, F. App'x 7, 8-9 (2d Cir. 2016). As set out below, each of the four discretionary factors weigh in favor of the Application.

***i. Lazard is Not a Participant in the Foreign Proceedings***

Lazard is not a party to or participant in any of the Foreign Proceedings. (Landy Decl. Ex. A (Refalo Decl. at ¶ 5)); (Landy Decl. Ex. B (Markušić Decl. at ¶ 5)); (Landy Decl. Ex. C (Zandbergen Decl. at ¶¶ 5-8)); (Landy Decl. Ex. D (Lansky Decl. at ¶ 5)); *In re Bank J. Sarasin AG*, 25-MC-00369 (MMG), 2025 WL 3171876, at *2 (S.D.N.Y. Nov. 13, 2025) (finding that the first discretionary factor weighed in favor of the application as discovery was sought from a company that was not a party to the foreign proceedings at issue); *In re Guriev*, 25-MC-0128 (JAV), 2025 WL 2381702 (S.D.N.Y. Aug. 15, 2025) (finding that because a party whom information was sought was not a participant in pending foreign proceedings, the first discretionary favor weighed in favor of discovery); *In re Itau Unibanco S/A – Nassau Branch*, No. 1:24-MC-

00459 (KHP), 2025 WL 918462, at *8 (S.D.N.Y. Mar. 26, 2025) (same). Therefore, the first discretionary factor strongly weighs in favor of granting the Application.

***ii. The Foreign Tribunals are Receptive to U.S. Judicial Assistance***

Under the second discretionary factor, courts have consistently found that absent specific directions from a foreign forum that it would reject evidence obtained with the aid of Section 1782, the factor should weigh in favor of granting the requested discovery. *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) (stating that a district court "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," such as proof "embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures"); *In re Safra*, No. 21-MC-0640 (GHW) (JLC), 2022 WL 3584541, at *5 (S.D.N.Y. Aug. 22, 2022) (noting that "objection to U.S. federal-court judicial assistance would have to come from official sources, such as an agent of the [foreign] government"); *In re Ex Parte Application of Porsche Automobil Holding SE for an Ord. Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proc.*, No. 15-MC-417 (LAK), 2016 WL 702327, at *8 (S.D.N.Y. Feb. 18, 2016) (stating that the "law on this factor is clear: District courts have been instructed to tread lightly and heed only clear statements by foreign tribunals that they would reject Section 1782 assistance").

Here, the courts in Malta, Croatia, the Netherlands, and the EU do not prohibit or discourage evidence obtained with the aid of a Section 1782 application from being used in proceedings. (Landy Decl. Ex. A (Refalo Decl. at ¶ 8)); (Landy Decl. Ex. B (Markušić Decl. at ¶ 8)); (Landy Decl. Ex. C (Zandbergen Decl. at ¶ 12)); (Landy Decl. Ex. D (Lansky Decl. at ¶ 8)); *In re SBK Art LLC*, No. 24-MC-0147 (PAE) (RFT), 2024 WL 4264893, at *14 (S.D.N.Y. July 30,

2024) (finding that the second *Intel* factor weighed in favor of the application when discovery was sought for use in Malta); *In re West African Mineral Trading Ltd.*, 24 Misc. 114 (DEH), 2024 WL 3862293, at *4 (S.D.N.Y. Aug. 19, 2024) (finding that the second *Intel* factor weighed in favor of the application when discovery was sought for use in Croatia); *Matter of Upper Brook Companies*, No. 22-MC-97 (PKC), 2022 WL 18046694, at *7 (S.D.N.Y. Dec. 29, 2022) (finding that the second *Intel* factor weighed in favor of the application when discovery was sought for use in the Netherlands); *Qualcomm Incorporated*, No. 18-MC-80134-NC, 2018 WL 6660068, at *3 (N.D. Cal. Dec. 19, 2018) (finding the second *Intel* factor weighed in favor of the application when discovery was sought for use in the General Court of the EU). Therefore, the second discretionary factor weighs in favor of granting the Application.

#### ***iii. The Application Does Not Circumvent the Rules of the Foreign Tribunals***

The third discretionary factor does not amount to a "foreign-discoverability requirement." *In Re SBK ART LLC*, No. 25-1563-CV, 2026 WL 478787, at *11 (2d Cir. Feb. 20, 2026); *Mees*, 793 F.3d at 303. In other words, the evidence requested does not need to be discoverable in the foreign proceedings for a Section 1782 application to be granted. *Intel*, 542 U.S. at 261 (explaining that "[w]hile comity and parity concerns may be important as touchstones for a district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discoverability rule into the text of [Section] 1782(a)"); *Mees*, 793 F.3d at 303 (stating that "the availability of the discovery in the foreign proceedings should not be afforded undue weight"); *In re Application for an Order Permitted Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (noting that the third discretionary factor is "not meant to authorize the denial of discovery pursuant to [Section] 1782 solely because such discovery is unavailable in the foreign court"). Rather, the "proof gathering restrictions" in the third discretionary factor are implicated

"[o]nly where materials being sought are privileged or otherwise prohibited from being discovered or used." *In re Tiberius Grp. AG*, No. 19-MC-467 (VSB), 2020 WL 1140784, at *4 (S.D.N.Y. Mar. 6, 2020).

When applying the third discretionary factor, a court also does not need to determine if the discovery requested would be admissible for use in the foreign proceedings. *Sampedro v. Silver Point Cap., L.P.*, 818 F. App'x 14, 17 (2d Cir. 2020) (stating that the Second Circuit's precedents make clear that "discovery need not be admissible to be for use in a litigation, as there is no statutory basis for such a requirement"); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) (noting that "requiring a district court to apply the admissibility laws of the foreign jurisdiction would require interpretation and analysis of foreign law and such [c]omparisons of that order can be fraught with danger"). Further, an applicant does not need to first seek the discovery from the foreign tribunal where proceedings are held before pursuing a Section 1782 application. *In re Itau Unibanco S/A - Nassau Branch*, No. 1:24-MC-00459 (KHP), 2025 WL 918462, at *9 (S.D.N.Y. Mar. 26, 2025) (explaining that "the law is clear that a party seeking discovery pursuant to Section 1782 need not first seek discovery from the foreign tribunal"); *In re Top Matrix Holdings Ltd.*, 18 Misc. 465 (ER), 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020) (stating that "failure to exhaust all remedies does not demonstrate an attempt to circumvent foreign restrictions").

Here, SBK seeks documents in Lazard's possession that are not subject to any "proof gathering restrictions" in the Foreign Proceedings, and SBK does not seek to violate foreign prohibitions with its discovery requests, which are made in good faith.

As set forth in the declarations of John Refalo, Don Markušić, Bart Zandbergen, and Dr. Gabriel Lansky, the materials being sought are not privileged nor otherwise prohibited from being

discovered or used in Malta, Croatia, the Netherlands or the EU courts. (Landy Dec. Ex. A (Refalo Decl. at ¶ 9)); (Landy Decl. Ex. B (Markušić Decl. at ¶ 9)); (Landy Decl. Ex. C (Zandbergen Decl. at ¶ 12)); (Landy Decl. Ex. D (Lansky Decl. at ¶ 9)); For these reasons, the third discretionary factor weighs in favor of granting the Application.

As noted above, Mr. Alketbi, who is not the petitioner here, sought disclosures from Lazard's French subsidiary in Paris in connection with a separate contemplated litigation regarding his personal attempt to participate in the Lazard sale process. (Landy Decl. Ex. E (Pujos Statement at ¶ 5)). Mr. Alketbi's request included information maintained on devices, including personal devices of Lazard employees, maintained in Paris, which is not the subject of the Application. (*Id.* at ¶¶ 4, 8). Further, while Mr. Alketbi's effort to seize materials was initially successful, the Paris Commercial Court and Paris Court of Appeal ultimately disallowed disclosure on the grounds that the *ex parte* seizure of material was unwarranted. (*Id*. at ¶¶ 7-17). In sum, Mr. Alketbi's litigation efforts in France have no impact on SBK's Application. The Foreign Proceedings at issue here are ongoing and the discovery sought is material held by Lazard in New York (or accessible from New York), as opposed to uniquely in Paris, and granting the Application would not have the impact of circumventing the rulings of the French courts. (*Id.* at ¶¶ 5, 6).

#### ***iv. The Application is Narrowly Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure***

The fourth discretionary factor requires the court to determine if the requested discovery is unduly intrusive or burdensome, which is determined by applying the standards of Rule 26 of the Federal Rules of Civil Procedure. *Mees*, 793 F.3d at 302. In this context, Rule 26 "contemplate[s] that discovery requests be tailored to seek information relevant to the parties' claims and defenses and proportional to the needs of the case." *Associacao dos Profissionais dos Correios v. Bank of New York Mellon Corp.*, No. 22-MC-0132 (RA) (KHP), 2022 WL 4955312, at *8 (S.D.N.Y. Oct.

4, 2022). The Second Circuit has instructed that it is "far preferable for a district court to reconcile whatever misgiving it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Mees*, 793 F.3d at 302.

Here, SBK's discovery requests are not unduly intrusive or burdensome for two reasons. First, the requests are narrowly tailored in time and scope to obtain relevant information and documents from Lazard regarding its role in and involvement with the MidCo sale process and the valuation analyses performed in connection with that transaction. Second, the information and documents sought are maintained and accessible in the normal course of business by Lazard and would not be unduly burdensome for Lazard to produce. Therefore, the fourth discretionary factor also weighs in favor of granting the Application.

### C. Granting the Application *Ex Parte* is Appropriate and Fair

Finally, in addition to the statutory requirements being met and the discretionary factors weighing in favor of SBK, granting the Application *ex parte* would be consistent with the plain language of Section 1782(a). The Second Circuit has recognized that granting applications under Section 1782 *ex parte* does not violate due process and that it is common practice to do so. *Gushlak v. Gushlak*, 486 Fed. App'x. 215, 217 (2d Cir. 2012) (explaining that "it is neither uncommon nor improper for district courts to grant applications made pursuant to [Section] 1782 *ex parte*. The respondent's due process rights are not violated because he can later challenge discovery requests by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)"); *In re Hornbeam Corp.*, 722 F.App'x 7, 10 (2d Cir. 2018) (stating that "[t]his court has decided appeals from motions to quash *ex parte* without identifying any impropriety in the *ex parte* nature of the [Section] 1782 application"; *In re Zarzur*, 22 Misc. 348 (AT), 2024 WL 81517, at *1 (S.D.N.Y. Jan. 8, 2024)

(noting that district courts "routinely grant [Section 1782] petitions *ex parte*"). Thus, it is entirely appropriate for this Court to grant the Application *ex parte*.

**CONCLUSION**

For the reasons set forth above, SBK respectfully requests the Court to issue an Order granting the Application and authorizing SBK to serve Lazard in New York with the subpoenas attached to Declaration of Robert S. Landy as Exhibits F and G directing Lazard to produce the requested discovery in its possession, custody, or control and to appear for a deposition.

Dated: June 16, 2026

Respectfully submitted,

*/s/ Robert S. Landy*

Robert S. Landy
Renée L. Jarusinsky
Amy C. Brown
Julián Alejandro Ríos
FORD O'BRIEN LANDY, LLP
275 Madison Avenue, 24th Floor
New York, New York 10016
Telephone: (212) 858-0040
Facsimile: (212) 256-1047
rlandy@fordobrien.com
rjarusinsky@fordobrien.com
abrown@fordobrien.com
jrios@fordobrien.com

*Counsel for Applicant*
*SBK ART LLC*